In the Supreme Court of Georgia

Decided:   March 27, 2015

S14A1914.  MOSLEY v. LANCASTER et al.

NAHMIAS, Justice.

This case involves a dispute among the grandchildren of Mildred Warnock Hilton ("Decedent") concerning the distribution of her estate.  The probate court denied probate of Decedent's purported 1988 will, which meant that her estate would be distributed according to the rules of intestate succession.  On de novo appeal to the superior court, the parties stipulated to a bench trial, after which the superior court affirmed the probate court's decision, ruling that Decedent had revoked her 1988 will and it was not validated by the doctrine of "dependent relative revocation."  The grandchild who offered the 1988 will for probate now appeals to this Court, arguing that the superior court lacked subject matter jurisdiction to deny probate of the will without impaneling a jury and also challenging the court's judgment on the merits.  We affirm.

1.     This case has a long and complicated factual and procedural history, which we recount to put our later discussion of the legal issues in context.

Viewed in the light most favorable to the superior court's judgment, see Thomas v. Sands, 284 Ga. 529, 530 (668 SE2d 731) (2008), the facts are as follows. Decedent died on July 23, 2004, at the age of 95. She and her husband, Chester Hilton, had two children, Joe and James. Joe had three children: Joe Hilton, Jr. and appellees Teresa Hilton Lancaster and Donna Hilton Swinson. James had two children: appellant Jamie Hilton Mosley and appellee Jimmy Hilton.

Prior to her death, Decedent executed two documents purporting to be her last will and testament, the first dated June 23, 1988 (the "1988 Will"), and the second dated June 28, 2004 (the "2004 Will"). When the 1988 Will was executed, Decedent's son Joe and her grandson Joe, Jr. were already deceased. The 1988 Will left Decedent's son James a 150-acre parcel of land and a smaller tract outright, as well as a life estate in a second 150-acre parcel and a 100-acre parcel with the remainder of each to his children Jamie and Jimmy in equal shares on his death. The 1988 Will directed the sale of the merchantable timber on the second 150-acre parcel within 12 months after Decedent's death, with the proceeds to be distributed one-third to Decedent's son James and one-third each to Teresa and Donna, Decedent's two living grandchildren through her son Joe. That will also gave Donna a conditional life estate in a half-acre tract of land

2

with the remainder on Donna's death to her living children, if any, and otherwise to Decedent's son James. The residue of Decedent's estate was left to her husband Chester. The 1988 Will nominated Chester and James to be the co-executors of Decedent's estate.

Several events bearing on the distribution and administration of Decedent's estate occurred between the execution of the 1988 Will and the 2004 Will. Decedent's son James died in October 1999, and her husband Chester died in December 2000. In January 2001, Decedent's estranged granddaughter Teresa sent her a letter stating that Teresa had consulted with an attorney and that she wanted to disclaim any interest in Decedent's estate. And on February 13, 2004, James's widow, Joy Hilton, died, after which Decedent expressed unhappiness with the way Joy's will distributed her estate between her children Jamie and Jimmy, who is disabled.[1]

---

[1] At trial, Jamie and her husband testified to the following. Two weeks after Joy's death, Decedent called Jamie and asked to see her. Jamie went with her husband to see Decedent, who said that Joy was concerned before her death about the future of her children. Decedent said that she wanted to reassure Jamie that Jamie and her brother were going to be taken care of. Decedent then gave Jamie a copy of the 1988 Will along with Teresa's 2001 letter, told Jamie to keep them together, and told Jamie that the 1988 Will expressed the way that she wanted her estate distributed when she died. The superior court was entitled, however, to disbelieve all of this testimony, none of which the court mentioned in its order. See Britt v. Sands, 294 Ga. 426, 427 (754 SE2d 58) (2014); Tanksley v. Parker, 278 Ga. 877, 877-878 (608 SE2d 596) (2005).

3

Over the next few months, Decedent declined physically and mentally. In June 2004, Decedent's brother, J'Mon Warnock, set up a meeting between Decedent and attorney Tom Everett to discuss the preparation of a new will. Warnock drove Decedent to the meeting, at which Decedent gave Everett the original of her 1988 Will, which had X's marking out some provisions and comments written in the margins and between lines in ink. Decedent told Everett that she wanted to change her 1988 Will. Everett went over the marked-up will with Decedent, but he could not determine from that document and the markings alone what Decedent wanted, so he asked Decedent how she wished her estate to be distributed. Everett then prepared the 2004 Will based on the marked-up original of the 1988 Will, his conversation with Decedent, and his meeting notes.

On June 28, 2004, Decedent returned to Everett's office with Warnock and their sister Florence Overstreet, and Decedent executed the 2004 Will before Everett and two disinterested witnesses. In Decedent's presence and at her direction, Everett then tore up the original of the 1988 Will and threw it into the trash. The primary beneficiaries of the 2004 Will were Warnock and Overstreet, and the 2004 Will nominated them to be the co-executors of Decedent's estate.

4

Donna was left a life estate in a half-acre tract of land along with $50,000 and some personal property; Jamie was left only some personal property; Decedent's disabled grandson Jimmy was left $150,000 in trust; and Teresa was left nothing.

Decedent died less than a month later on July 23, 2004. In August 2004, Warnock and Overstreet filed a petition to probate the 2004 Will in solemn form, and Jamie filed a caveat. In December 2004, the probate court admitted the 2004 Will to probate. Jamie then appealed to the superior court and demanded a jury trial. In February 2006, the jury returned a verdict finding that Decedent lacked the mental capacity to make a valid will on June 28, 2004; the jury made no finding as to undue influence. Warnock and Overstreet then filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial.

In May 2006, Jamie filed a petition in the probate court to admit the 1988 Will to probate in solemn form, and Teresa filed a caveat, as she would benefit more if Decedent died intestate. Meanwhile, proceedings continued in the superior court on the 2004 Will. In January 2007, the superior court entered a JNOV admitting the 2004 Will to probate and granting a new trial in the event

that the JNOV was overturned on appeal, on the ground that the verdict was contrary to the weight of the evidence. See OCGA § 9-11-50 (c) (1). Jamie appealed, and this Court reversed the JNOV but affirmed the grant of a new trial. See Mosley v. Warnock, 282 Ga. 488, 488-490 (651 SE2d 696) (2007). At the second trial on the 2004 Will, which was held in February 2008, the jury returned a verdict on special interrogatories finding that Decedent had the mental capacity to make a valid will on June 28, 2004, but the 2004 Will was invalid because it was the product of undue influence. The superior court entered judgment on that verdict, and that judgment was not appealed.

Attention then turned back to the probate court proceedings on the 1988 Will. In September 2008, Teresa, Donna, and Appellant Jamie's brother Jimmy (collectively, "Appellees") filed a caveat to the 1988 will. The probate court held a hearing and in January 2010 entered an order denying probate of the 1988 Will. Appellant appealed to the superior court. Appellees filed a motion for summary judgment, which the superior court denied in April 2012, on the ground that disputed issues of material fact remained regarding Decedent's intent to revoke the 1988 Will and the relationship between the making of the 2004 Will and the destruction of the 1988 Will. The parties stipulated to a

bench trial on all issues, which was held on February 8, 2013. On June 2, 2014, the superior court entered an order affirming the probate court's denial of probate of the 1988 Will, ruling that it was Decedent's intent to revoke the 1988 Will and the will was not validated by the doctrine of dependent relative revocation. Appellant filed a timely notice of appeal to this Court.

2. Appellant contends first that the superior court lacked subject matter jurisdiction to deny probate of the 1988 Will without impaneling a jury, even though the parties stipulated to a bench trial. Appellant cites OCGA § 15-6-8 (4) (E), which gives the superior courts

> authority . . . (4) . . . to review and correct, in the manner prescribed by law, the judgments of . . . (E) Judges of the probate courts, except in cases touching the probate of wills and the granting of letters of administration, in which a jury must be impaneled. . . .

According to Appellant, this statute requires a jury trial in all cases "touching the probate of wills" regardless of the parties' wishes, and the failure to hold a jury trial therefore deprives the superior court of subject matter jurisdiction to review and correct a probate court judgment on the probate of a will.

Appellant cites no authority for the proposition that a court's subject matter jurisdiction depends on whether a jury trial or a bench trial is held. To

the contrary, Appellant's notion that the fact-finding process used to decide a particular case determines the court's jurisdiction to decide the case conflicts with this Court's description of subject matter jurisdiction:

> The phrase jurisdiction of the subject matter refers to subject matter alone, i.e., conferring jurisdiction in specified kinds of cases. It is the power to deal with the general abstract question, to hear the particular facts in any case relating to this question. Jurisdiction of the subject matter does not mean simply jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which that particular case belongs.

Crutchfield v. Lawson, 294 Ga. 407, 409 (754 SE2d 50) (2014) (citations and quotation marks omitted). Article VI, Section IV, Paragraph I of the Georgia Constitution of 1983 establishes the superior courts as courts of general jurisdiction with original and appellate jurisdiction as provided by law, and OCGA § 15-6-8 (4) (E) grants superior courts jurisdiction to review the judgments of probate courts, including those touching on the probate of wills. Thus, it is clear that the superior court had jurisdiction of the "class of cases" to which this case belongs. Crutchfield, 294 Ga. at 409.

Moreover, OCGA § 15-6-8 (4) (E)'s statutory grant of a right to a jury trial must be construed together with other statutes relating to the same issue –

8

"in pari materia," to use the Latinate legal terminology. See Horn v. Shepherd, 292 Ga. 14, 20-21 (732 SE2d 427) (2012). With respect to civil actions like this case, OCGA § 9-11-38 says that "[t]he right of trial by jury as declared by the Constitution of the state or as given by a statute of the state shall be preserved to the parties inviolate," but § 9-11-39 (a) then explains that "[t]he parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, may consent to trial by the court sitting without a jury." See also Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a) ("The right to trial by jury shall remain inviolate, except that the court shall render judgment without the verdict of a jury in all civil cases where no issuable defense is filed and where a jury is not demanded in writing by either party. . . ."); OCGA § 1-3-7 ("[A] person may waive or renounce what the law has established in his favor when he does not thereby injure others or affect the public interest.").

Read together, § 15-6-8 (4) (E) gives parties a statutory right to a jury trial in cases, like this case, touching the probate of wills, but § 9-11-39 (a), like the Constitution and § 1-3-7, permits the parties to waive that right and have a bench trial instead. A review of the Code provisions relating to the probate

9

courts in our larger counties, which are authorized to hold jury trials, further confirms this reading. OCGA § 15-9-121 (a) gives parties in those courts the right to a jury trial in most cases if a timely written demand is made, but the statute then says explicitly, "If a party fails to assert the right to a jury trial, the right shall be deemed waived and may not thereafter be asserted." See also Ellis v. Johnson, 291 Ga. 127, 128 n.1 (728 SE2d 200) (2012) ("[I]n probate courts that do not meet the population threshold, there are no jury trials and the probate court's decision may be appealed to the superior court for a de novo proceeding, which *may* include a jury trial, followed by a potential appeal to an appellate court." (emphasis added)).

In sum, we hold that the superior court had subject matter jurisdiction to review the probate court's decision pursuant to Article VI, Section IV, Paragraph I of the Constitution and OCGA § 15-6-8 (4) (E). The parties had a statutory right to a jury trial because this case is one touching the probate of wills, but the parties waived this right by stipulating to a bench trial, as authorized by OCGA § 9-11-39 (a) and as permitted by § 1-3-7 and Article I, Section I, Paragraph XI (a) of the Constitution. Compare Goodrich v. Goodrich, 302 Ga. App. 468, 468-469 (691 SE2d 332) (2010) (holding that the superior

court committed reversible error in reviewing the probate court's appointment of an administrator without impaneling a jury where one of the parties requested a jury trial). The parties' waiver of a jury trial did not deprive the superior court of subject matter jurisdiction to deny probate of the Decedent's 1988 Will.

3. Turning now to the merits of the case, Appellant contends that the superior court erred in failing to apply the doctrine of dependent relative revocation to revive the 1988 Will. This Court has articulated that doctrine as follows:

> If it is clear that the cancellation [of the old will] and the making of the new will were parts of one scheme, and the revocation of the old will was so related to the making of the new as to be dependent upon it, then, if the new will be not made, or, if made, is invalid, the old will, though canceled, should be given effect, if its contents can be ascertained in any legal way.

McIntyre v. McIntyre, 120 Ga. 67, 71-72 (47 SE 501) (1904). Dependent relative revocation is a doctrine of presumed intent, which may be rebutted. See Warner v. Reynolds, 273 Ga. 802, 803 (546 SE2d 520) (2001).

Revocation of a will may be express or implied. See OCGA § 53-4-42 (a). An express revocation "takes effect instantly" when the testatrix "by writing or action expressly annuls a will." OCGA § 53-4-42 (b). OCGA § 53-4-44 says:

11

An express revocation may be effected by any destruction or obliteration of the will done by the testator with an intent to revoke or by another at the testator's direction. The intent to revoke shall be presumed from the obliteration or cancellation of a material portion of the will, but such presumption may be overcome by a preponderance of the evidence.

In addition, "[a] presumption of intent to revoke arises if the original of a testator's will cannot be found to probate." OCGA § 53-4-46 (a).

In this case, based on attorney Everett's trial testimony, the superior court could find that the markings on the original 1988 Will that Decedent brought with her to the June 2004 meeting with Everett were so extensive that it could not be determined, even by an experienced lawyer, what she intended to remove and what, if anything, was intended to remain. We must defer to the superior court's interpretation of Everett's testimony about the condition of the 1988 Will when he first saw it. See Thomas, 284 Ga. at 530. And this obliteration or cancellation of a material portion of the original 1988 Will raised a presumption that Decedent intended to revoke that will, see OCGA § 53-4-44, which Appellant failed to rebut.

Accordingly, the superior court did not err in concluding that the 1988 Will was revoked prior to Everett's meeting with Decedent and that the doctrine

12

of dependent relative revocation therefore did not apply. See Mincey v. Deckle, 283 Ga. 579, 580 (662 SE2d 126) (2008) ("There is no evidence that Decedent's revocation of the [earlier] Will was dependent upon the creation of a new will. To the contrary, it appears that Decedent revoked the [earlier] Will before he even visited an estate planning attorney about creating a new will."); McIntyre, 120 Ga. at 71-72 ("[I]f the old will is once revoked, – if the act of revocation is completed, – as if the will be totally destroyed by burning and the like, or if any other act is done which evidences an unmistakable intention to revoke, though the will be not totally destroyed, the fact that the testator intended to make a new will, or made one which can not take effect, counts for nothing."). This discarding of the original will at Decedent's direction, making it unavailable for probate, established a second presumption of revocation that supported the superior court's conclusion. See OCGA § 53-4-46 (a); Britt, 294 Ga. at 427 (explaining that whether a presumption of revocation is overcome is a determination for the trier of fact, which must be upheld on appeal if there is any evidence to sustain it).

4. Appellant also argues that Decedent lacked the requisite mental capacity to revoke the 1988 Will as a matter of law due to the prior, unappealed

jury finding that the 2004 Will was invalid as a result of undue influence by Decedent's brother and sister. However, mental capacity and undue influence, while related in some ways, are distinct grounds for finding a will to be invalid. See OCGA §§ 53-4-11 (a) (defining testamentary capacity), 53-4-12 (describing undue influence). And the prior jury found that Decedent *had* the mental capacity to make the 2004 Will when she met with attorney Everett to discuss a new will, which meant that she also had the mental capacity to revoke her 1988 Will. See Murchison v. Smith, 270 Ga. 169, 172-173 (508 SE2d 641) (1998) (explaining that the same mental capacity is required to make or revoke a will); King v. Bennett, 215 Ga. 345, 351 (110 SE2d 772) (1959) (same). Moreover, that Decedent's brother and sister unduly influenced her to make the *particular* new will that primarily benefitted them does not necessarily mean that they also unduly influenced her to revoke her old will before meeting with Everett. The jury that found undue influence in the execution of the 2004 Will was not asked to decide whether the Decedent's revocation of the 1988 Will was similarly infected by undue influence.

The record shows that the relevant circumstances had changed significantly in the 16 years since the execution of the 1988 Will, giving

14

Decedent good reasons to want to revoke the old will. Several people listed in the 1988 Will had died, including both of the co-executors named in the will; Decedent had become estranged from one of her granddaughters, who had formally disclaimed any interest in Decedent's estate; and Decedent's daughter-in-law Joy had recently died, leaving a will that distributed her estate to Jamie and to her disabled son Jimmy in a manner that concerned Decedent. The evidence presented at trial was sufficient for the superior court to find, as a matter of fact, that Decedent had the necessary mental capacity to revoke her 1988 Will, and the court was not precluded from doing so as a matter of law.

5.     Finally, Appellant argues that the superior court erred to the extent that it relied on the express revocation clause of the 2004 Will, despite the unappealed finding of undue influence in the making of that will. However, the court cited the revocation clause of the 2004 Will only as "further evidence" of Decedent's intent to revoke the 1988 Will and acknowledged that it would be insufficient standing alone to prove revocation of the 1988 Will. Accordingly, even assuming that the court erred in considering the revocation clause, any such error does not require reversal of the court's judgment, which was otherwise sufficiently supported.

Judgment affirmed. All the Justices concur.

15